IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-01904-MSK-BNB

WILMA G. VIALPANDO,

        Plaintiff,

v.

MIKE JOHANNS, Secretary, United States Dept. of Agriculture,

        Defendant

---

## OPINION AND ORDER DENYING MOTION FOR NEW TRIAL AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, AND GRANTING, IN PART, MOTION FOR ATTORNEY'S FEES AND COSTS

---

**THIS MATTER** comes before the Court pursuant to the Defendant's Renewed Motion for Judgment as a Matter of Law (**# 53**), the Plaintiff's response (**# 57**), and the Defendant's reply (**# 63**); the Plaintiff's Motion for New Trial (**# 55**), the Defendant's response (**# 59**), and the Plaintiff's reply (**# 64**); and the Plaintiff's Motion for Attorney's Fees and Costs (**# 54**), the Defendant's response (**# 65**), and the Plaintiff's reply (**# 68**).

## <u>FACTS</u>

In summary, the Plaintiff claimed that three adverse employment actions against her were the result of age discrimination, sex discrimination, discrimination based on her national origin, and/or retaliation for her having filed prior discrimination complaints against a former supervisor. The three adverse employment actions at issue were: (i) the alleged interference of her manager, Irving Thomas, in a 2001 "desk audit" of the Plaintiff's job that ultimately concluded that her

1

work did not entitle her to be paid at a GS 14 level; (ii) an incident in 2004 when her immediate supervisor, Jim Everedge, recommended that she receive a $5,000 performance bonus, but which Thomas overruled, instead authorizing only a $2,000 bonus; and (iii) an incident in 2004, when a selection panel, including Thomas, rejected the Plaintiff's request for appointment to an open position for Deputy Director. The specific evidence supporting each claim is discussed in more detail below as necessary.

The case proceeded to trial before a jury in May 2007. During the course of trial, the Court granted the Defendant's oral motion pursuant to Fed. R. Civ. P. 50(a), dismissing the Plaintiff's claims of sex, national origin, and age discrimination in their entirety, and dismissing all claims relating to the desk audit **(# 47)**. Thus, the jury was tasked only with deciding: (i) whether her non-selection for the open Deputy Director position was retaliatory; (ii) whether Thomas' reduction of the Plaintiff's recommended bonus was retaliatory; and (iii) if either act was retaliatory, what were the appropriate damages. The jury returned a partial verdict for the Plaintiff, finding that Thomas' reduction of her bonus was retaliatory, but that no retaliation had occurred regarding her non-selection for the vacant Deputy Director position. The jury also found that the damages sustained by the Plaintiff as a result of the retaliatory reduction of her bonus were $7,000.

Both parties filed post-verdict motions. The Defendant renews **(# 53)** its oral motion for judgment as a matter of law pursuant to Rule 50 with regard to the claim based on the denial of the bonus, contending that: (i) Thomas' reduction of her bonus from the $5,000, recommended by Everedge, to the $2,000 actually awarded to her does not constitute an adverse employment

action; and (ii) there was insufficient evidence of a causal connection between the Plaintiff's protected activity in 1998 and 2003, and the denial of the bonus in 2004.

Separately, the Plaintiff moves for a new trial (**# 55**), arguing that: (i) the Court erred in instructing the jury that she must prove that "but for" her protected conduct, the Defendant would not have taken an adverse action against her; (ii) the Court failed to adequately define the term "pretext" in its instructions to the jury; and (iii) the Court improperly granted judgment as a matter of law to the Defendant on her discrimination claims as they related to the desk audit. In addition, the Plaintiff has moved for an award of attorney's fees (**# 54**).

**A. Plaintiff's motion**

Because the merits of the Plaintiff's motion also inform, to some extent, her arguments in opposition to the Defendant's motion, the Court turns first to the Plaintiff's motion for a new trial.

1. The "but for" jury instruction

The Plaintiff contends that the Court erred in instructing the jury that the Plaintiff must prove that the adverse employment actions would not have occurred "but for" her protected activity. The Plaintiff argues that the law only requires her to prove that her protected conduct was a "motivating factor" in the employer's decision to take the adverse actions.

Analysis of whether the correct standard is "but for" or a "motivating factor" is by no means clear or straightforward. The 10th Circuit has not spoken definitively on the question. Attempts to divine the correct rule of law from analogous caselaw is confounded by the use of casual or imprecise language. Recognizing that the resolution of this issue is likely to require further review by the 10th Circuit, the Court sets out its reasoning on this issue in some detail.

The Plaintiff's retaliation claim arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* That statute prohibits two major classes of unlawful acts. First, 42 U.S.C. § 2000e-2(a) provides that an "unlawful employment practice" occurs when an employer "fail[s] or refuse[s] to hire, or [ ] discharge[s] any individual, or [ ] otherwise discriminate[s] against any individual . . . because of such individual's race, color, religion, sex, or national origin" (a "disparate treatment claim"). Second, 42 U.S.C. § 2000e-3(a) provides that an "unlawful employment practice" occurs when an employer "disciminate[s] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation" (a "retaliation claim").

Before submission of the case to a factfinder, courts analyze retaliation claims under a modified version of the traditional burden-shifting analysis of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).[1] The employee is required to establish a *prima facie* case of retaliation by showing that he or she engaged in some form of protected activity, that he or she suffered an adverse employment action, and that there is some indication of a causal connection between these two events. If the employee establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action, and the employee has the ultimate burden of proving that the employer's proffered reason is a pretext for illegal retaliation. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006). As

---

[1]Some courts refer to the *McDonnell-Douglas* framework as the "*Burdine*" analysis, referring to *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). In the interests of consistency, where this Court quotes cases referencing *Burdine*, it has conspicuously edited those quotations to refer to *McDonnell-Douglas*.

discussed more fully below, the *McDonnell-Douglas* analysis is sometimes called a "pretext analysis."

However, the *McDonnell-Douglas* analysis is merely an analytical framework for the Court's use in adjudicating whether there is sufficient evidence to survive a challenge under Fed. R. Civ. P. 50(a) or 56 and submit the claim to a jury. When the case is submitted to the factfinder at trial, the *McDonnell-Douglas* scheme "drops out" of the analysis, and the ultimate question for the factfinder is simply whether the adverse action occurred "because of" the protected conduct. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000). Because the *McDonnell-Douglas* framework is a tool for the <u>Court</u>, not the <u>jury</u>, the vast bulk of the caselaw discussing retaliation claims – most of which arises in the context of summary judgment or a motion for judgment as a matter of law – is not particularly helpful in establishing what must be proven to the jury. Indeed, the parties have not cited, and the Court's own research has not revealed, any case in which the 10th Circuit has specifically approved or rejected a <u>jury instruction</u> explaining the how the phrase "because of" in Title VII should be applied. Nor, for that matter, has the Court located any precedent from this Circuit particularly addressing the quantum of proof that is necessary to support a jury verdict in a retaliation claim.

A handful of cases in other circuits have addressed that precise question. In *Septimus v. University of Houston*, 399 F.3d 601, 608 (5th Cir. 2005), the court vacated a retaliation verdict in favor of an employee, finding that it was plain error for the trial court to instruct the jury that the employee had to prove that her protected conduct was a "motivating factor" of the employer's decision to take an adverse action against her. It explained that "[t]his court has consistently held that in retaliation cases where the defendant has proffered a nondiscriminatory purpose for the

adverse employment action[,] the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated." *Id.* (internal quotes omitted), *citing, inter alia, Pineda v. United Parcel Service, Inc*., 360 F.3d 483, 487 (5th Cir. 2004) *and Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001).

The 3d Circuit reached the same conclusion after extensive analysis in *Woodson v. Scott Paper Co.*, 109 F.3d 913, 932 (3d Cir. 1997). The court found that the trial court's "motivating factor" instruction was inconsistent with Third Circuit precedent which "requires a district court to instruct the jury that it can hold a defendant liable only if the prohibited activity had a determinative effect[2] on the decision to terminate the plaintiff." *Id.* Citing its prior opinions in *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 472 (3d Cir. 1993) and *Miller v. CIGNA Corp.*, 47 F.3d 586, 588 (3d Cir. 1995) (en banc), the court explained that in pretext-type cases, the giving of a "motivating factor" instruction is error, and the "determinative effect" instruction is the correct statement of law. 109 F.3d at 932.

The First Circuit reached a similar conclusion in *Provencher v. CVS Pharmacy*, 145 F.3d 5, 10 (1st Cir. 1998) (abrogated on other grounds, *see Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 405 (1st Cir. 2002)). There, the court stated that the trial court's use of a jury instruction containing "motivating factor" language was "problematic," in that the instruction did not necessarily "mak[e] it clear that liability should be imposed only if discrimination [sic] was the determinative factor." *Id.* The court nevertheless held that the instructions, as a whole, correctly instructed the jury that "liability could exist only if the jury [found] that retaliation was the reason

---

[2]This Court reads the phrase "determinative factor" to be equivalent to a "but for" test. A factor can only be "determinative" of an outcome if that outcome would not have occurred, but for the factor.

behind [the plaintiff's] discharge, but not if retaliation was a mere factor among many." *Id.* Notably, however, *Provencher* contains little analysis or authority supporting this conclusion, and has not been cited for this proposition by any other cases inside or outside the 1st Circuit.

This Court has located only one circuit court decision expressly finding that a "motivating factor," rather than a "but for" or "determinative factor" instruction, was the correct statement of law. In *Warren v. Prejean*, 301 F.3d 893, 901 (8th Cir. 2002), the court rejected – albeit without a material explanation of its reasoning – an argument by the employer that a "motivating factor" jury instruction was inconsistent with prior circuit precedent that appeared to suggest that the "but for" test was the controlling law. The court merely stated that such an interpretation of its prior precedent[3] was "unfounded," and that "[i]nstructing the jury that [the plaintiff] must prove by a preponderance of the evidence that her sex and grievance were motivating factors in [the employer's] decision to discharge her fairly and adequately reflects the applicable law of this circuit." *Id.*

The continuing vitality of *Warren* is called into doubt by the more recent and thorough examination of a similar question by the 8th Circuit in *Carrington v. City of Des Moines,* 481 F.3d 1046, 1053 (8th Cir. 2007). There, the court considered the trial court's granting of summary judgment to the employer in a retaliation case. The trial court had found that the employee had not come forward with sufficient evidence to demonstrate the "causal connection" element of the

---

[3]In *Akeyo v. O'Hanlon*, 75 F.3d 370, 373 (8th Cir. 1996), the court had stated "[e]ven if the protected conduct is a substantial element in the decision to terminate the employee, the employer will not be liable if the employee would have been discharged in the absence of the protected conduct." As discussed below, this language appears to be referring to the "same decision" defense permitted in mixed-motive cases by *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)

*prima facie* case.  On appeal, the employee argued that there was sufficient evidence in the record

to raise an issue of fact as to whether his protected conduct was a "motivating factor" in the

employer's adverse actions against him, and contended that "the [trial] court applied a different

standard to the analysis of the facts for Summary Judgment than what the Jury will see at trial."

481 F.3d at 1052 (internal quotes omitted).  The *Carrington* court found that "[a]t summary

judgment, Carrington must show . . . that the City's stated reason for discharge is pretextual and

that retaliation was a determinative – not merely a motivating – factor," and concluded that the

record could not support such a finding.  *Id.*  In doing so, the 8th Circuit specifically noted that its

pattern jury instructions call for a "motivating factor" instruction in "mixed-motive" cases, but

deem a "determining factor" instruction correct in pretext cases brought under the *McDonnell-*

*Douglas* analysis.  *Id.*  As a result, the *Carrington* court concluded that the trial court's use of a

"determinative factor" analysis "correctly applied the law to Carrington's retaliation claim, using

the same standard a jury would have used."  *Id.*

    This Court takes particular note of the rulings in *Woodson* and *Carrington*.  In both cases,

the court acknowledged that "motivating factor" might be the correct test in "mixed-motive"

cases.  The "mixed-motive" case paradigm was first articulated by the Supreme Court in *Price*

*Waterhouse v. Hopkins*, 490 U.S. 228 (1989).  In that case, Hopkins was denied partnership at

her job, in part because she failed to demonstrate sufficiently "feminine[]" behavior, and in part

because of legitimate reasons.  490 U.S. at 233-35.  Attempting to balance the anti-discrimination

goals of Title VII against employers' rights to base employment decisions on any permissible

considerations, the Court crafted an special analytical framework to be used only in such "mixed

motive" cases: the employee must show that discriminatory animus was at least a "motivating

8

factor" in the employer's decision, and, if the employee succeeds, the employer then can attempt

to prove, as an affirmative defense, that it would have made the "same decision," even in the

absence of the impermissible considerations.  490 U.S. at 244-45.

Initially, many courts interpreted *Price Waterhouse* to require direct evidence of

discrimination before a "mixed-motive" claim could be asserted.  *Desert Palace, Inc. v. Costa*,

539 U.S. 90, 95 (2003).  Thus, before the plaintiff could depart from the standard *McDonnell-*

*Douglas* "pretext" scheme, he or she would have to come forward with direct proof[4] of the

employer's discriminatory intent.  However, in *Desert Palace*, the Supreme Court expressly

rejected the notion that direct proof of discrimination was necessary in order to invoke the mixed-

motive analysis.  Instead, drawing on Congress' post-*Price Waterhouse* statutory codification[5] of

the "motivating factor" test, 42 U.S.C. § 2000e-2(m), the *Desert Palace* Court held that an

_____

[4]To come forward with "direct evidence" that a particular action was motivated by
discriminatory intent, the employee would have to adduce evidence that would "prove [the actor's
intent] without any process of inference, save the inferences of credibility."  *See e.g. Woodson*,
109 F.3d at 930, *citing* 22 Wright & Graham, Federal Practice and Procedure, § 5214.

[5]It is commonly stated that Congress "legislatively reversed" *Price Waterhouse* and
several other Supreme Court interpretations of Title VII in the Civil Rights Act of 1991.
However, close analysis of the actual holding of *Price Waterhouse* and the effect of 42 U.S.C. §
2000e-2(m) reveals that Congress legislatively changed little of *Price Waterhouse*'s "mixed-
motive" analysis.  Whether before or after the statutory change, the employee still enjoys the
"motivating factor" test, and the employer may still invoke the "same decision" defense.  *See* 42
U.S.C. § 2000e-5(g)(2)(B) (codifying "same decision" defense).  The only way in which Congress
changed the analysis set forth in *Price Waterhouse* relates to what happens when the employer
proves its "same decision" defense.  Under *Price Waterhouse*, the employer appeared to
completely avoid liability.  490 U.S. at 258 ("the defendant may avoid a finding of liability only by
proving by a preponderance of the evidence that it would have made the same decision").
Congress instead provided that, where the employer proves its defense, it avoids liability for
money damages to the aggrieved employee, but still faces the possibility of declaratory and some
forms of injunctive relief, as well as liability for attorney's fees.  42 U.S.C. § 2000e-5(g)(2)(B)(i),
(ii).

employee could invoke the "mixed-motive" analysis simply by presenting direct <u>or</u> circumstantial evidence that discrimination was a "motivating factor" in the employer's decision. *Id*. at 101-02.

In a practical sense, *Desert Palace* appears to swallow up the *McDonnell-Douglas* framework (at least as it relates to claims of disparate treatment discrimination, *see infra*). By eliminating the need for direct evidence, and holding that a plaintiff states a "mixed-motive" case simply by coming forward with circumstantial evidence of discriminatory intent, *Desert Palace* effectively renders <u>every</u> disparate treatment claim that survives summary judgment a "mixed-motive" claim. Put differently, if a plaintiff fails to come forward with at least <u>some</u> circumstantial evidence of discrimination, the employer will be entitled to summary judgment. Yet, once the plaintiff does so, he or she is now entitled to invoke the "mixed-motive" analysis and its corresponding "motivating factor" test.

However, *Desert Palace*'s reasoning is predicated on a statutory provision that applies solely to <u>disparate treatment</u> claims, not <u>retaliation</u> claims. The lynchpin of *Desert Palace*'s analysis is 42 U.S.C. § 2000e-2(m), a section newly-added to Title VII, in response to *Price Waterhouse*, as part of the Civil Rights Act of 1991. That section states "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." Thus, the statute codifies the "motivating factor" test in cases where "race, color, religion, sex, or national origin" are alleged to be the basis of the prohibited discrimination. Conspicuously absent from § 2000e-2(m), however, is any mention of retaliation or reference to "protected activity" being the motivating factor for the challenged employment practice. Whether it be by Congressional design or imprecise draftsmanship, it is

readily apparent that § 2000e-2(m) does not purport to apply to retaliation cases under Title VII. *See e.g. Carrington*, 481 F.3d at 1052; *Woodson*, 109 F.3d at 933-35.

Having followed the path all the way to the point where the "mixed-motive" and *McDonnell-Douglas* "pretext" analyses merge, we now begin backtracking. Because §2000e-2(m) does not apply to retaliation cases, such as the one at issue here, the reasoning of *Desert Palace*, which turned entirely on that statutory section, is not controlling. If *Desert Palace* does not control in retaliation cases, the Court must look to how the 10th Circuit applied the "mixed-motive" analysis before *Desert Palace*.[6] In *Shorter v. ICG Holdings*, 188 F.3d 1204, 1208 n 4 (10th Cir. 1999), the court made clear that "a mixed motives analysis only applies once a plaintiff has established direct evidence of discrimination." Thus, without the assistance of *Desert Palace* on her retaliation claim, the Plaintiff here was entitled to avail herself of the "mixed-motive" analysis – and its corresponding "motivating factor" test – only if she came forward with direct evidence that the adverse employment action(s) against here were motivated by her protected conduct.[7]

_____

[6]The Court has found no published caselaw from the 10th Circuit considering the "mixed-motive" analysis in retaliation claims after *Desert Palace*.

[7]Even assuming that this Court is incorrect, and that *Desert Palace* lightens the evidentiary burden on retaliation plaintiffs as well as disparate treatment plaintiffs, the Court would nevertheless find no error in failing to charge the jury under a "mixed-motive" theory because the Plaintiff never specifically invoked that theory during the trial of this case. The Court has reviewed the transcript of the entire charging conference, and at no point did the Plaintiff expressly state that she believed that she was entitled to proceed under a "mixed-motive" analysis. To the contrary, the Plaintiff requested and was granted an instruction on the issue of "pretext." As explained below, proceeding on a "pretext" theory is fundamentally inconsistent with proceeding on a "mixed-motive" theory, and the Court deems the Plaintiff to have elected the former to the exclusion of the latter. *See Price Waterhouse*, 490 U.S. at 247 n. 12 (anticipating that, prior to trial, a plaintiff will elect, or the trial court will determine, whether the "mixed-motive" or "pretext" test will apply).

The closest the Plaintiff came at trial to eliciting direct evidence of retaliatory intent on the part of any of the Defendants' agents was her own testimony that, in a meeting with Thomas to discuss a discrimination complaint she had filed in or about 1998, Thomas told her "that [she] was never going to be a GS 14; that [she] was only a quasi administrative officer." The Plaintiff also testified that Alvin Dillings told her that Thomas had stated "[she] would not be promoted; that it would be over his dead body and that he was going to make an example out of [her]." Obviously, neither of these statements is direct evidence that Thomas' decision to reduce the Plaintiff's recommended bonus from $5,000 to $2,000 was done with retaliatory intent. At best, one would have to infer from Thomas' 1998 statement that he "was going to make an example of [her]" that he would carry out that threat in 2004 by reducing the Plaintiff's bonus. Put differently, the Plaintiff did not put on evidence that, for example, Thomas admitted in or after 2004 that the Plaintiff's protected conduct was one of the reasons he chose to reduce her bonus. Without a direct acknowledgment that Thomas premised the reduction of her bonus on her prior protected activity, the Plaintiff came forward with nothing more than circumstantial evidence of Thomas' motives with regard to her bonus, and thus, she was not entitled to invoke the "mixed-motive" analysis with regard to that aspect of her retaliation claim.

Similarly, the evidence of statements made by Thomas to the effect that the Plaintiff "would never be a GS 14" and would be promoted "over my dead body" do not constitute direct evidence that Thomas' selection of Louis Black over the Plaintiff for the open Deputy Director (GS 14) position in August 2004 was motivated by retaliatory intent. Most importantly, the statements cited by the Plaintiff were made by Thomas in or about 1998, long before the non-selection of the Plaintiff in 2004. Proof that Thomas harbored a retaliatory intent in the past does

not amount to direct evidence of his intent at some later point in time; rather, the factfinder must

infer that Thomas continued to harbor the same animus he possessed in 1998, and that he

recognized the Plaintiff's nomination for the 2004 Deputy Director opening as a chance to act

upon it. Thus, Thomas' 1998 statements are circumstantial evidence of his possible motivations

in 2004, not direct evidence. The Plaintiff has not pointed to any direct evidence of Thomas'

retaliatory intent as it relates to her 2004 non-selection, and thus, she is not entitled to invoke the

"mixed-motive" analysis on either retaliation claim.

Finding that the Plaintiff cannot invoke the "mixed-motive" analysis and its attendant

"motivating factor" analysis does not end the inquiry, however. The question remains, under the

*McDonnell-Douglas* "pretext"-type analysis, is the employee's ultimate burden to show that her

protected activity was the "motivating" or "determinative" factor in the employer's decision?

As the foregoing discussion indicates, at least four circuit courts have expressly considered this

question and found that the "determinative" or "but for" standard is the correct one in "pretext"

type cases. By contrast, with the exception of *Warren*, which is called into great doubt by the

subsequent decision in *Carrington*, this Court has found no circuit authority that has expressly

considered the precise question presented here and endorsed a "motivating factor" test over a

"but for" one in a "pretext" case. This alone is persuasive evidence that the Court's "but for"

instruction in this case was correct.

In her Motion for a New Trial, the Plaintiff cites to *Price Waterhouse*, as well as to

*Medlock v. Ortho Biotech*, 164 F.3d 545 (10th Cir. 1999), *Johnson v. City of Tulsa*, 199

Fed.Appx. 677, 679 (10th Cir. 2006), and *Hillig v. Rumsfeld*, 381 F.3d 1028 (10th Cir. 2004). In

*Medlock*, the court considered a trial court's denial of an employer's motion to set aside a jury

verdict in favor of an employee in a Title VII retaliation case. There, the 10th Circuit explained that "Once plaintiff presented evidence that retaliation played a motivating part in defendant's decision to discharge him, it became defendant's burden to prove by a preponderance of the evidence that it would have made the same decision notwithstanding its retaliatory motive." 164 F.3d at 550. The quoted language merely repeats the *Price Waterhouse* "mixed-motive" analysis, which this Court has already concluded does not apply here. In addition, the 10th Circuit expressly found that the plaintiff there had come forward with direct evidence of discrimination. 164 F.3d at 551. Thus, *Medlock*'s reference to the "motivating factor" standard in the context of a "mixed-motive" case is not helpful in assessing what standard of proof applies in a *McDonnell-Douglas* "pretext" case such as this one.

In *Johnson*, the court considered an employee's appeal from a jury's verdict against him on his retaliation claim. There, too, the trial court had instructed the jury using the "mixed-motive" analysis, and the jury had found that the employer had harbored a retaliatory intent, but that the employer had proved its "same decision" affirmative defense. 199 Fed.Appx. at 679. The employee argued on appeal that there was insufficient evidence in the record to support the employer's affirmative defense. 199 Fed.Appx. at 683. Nothing in the *Johnson* case directly addresses the nature of the employee's burden in a "mixed-motive" case, much less purport to discuss the burden test that the employee must satisfy in a "pretext" case such as this one. Thus, *Johnson* appears to be entirely irrelevant to the issues here.

In *Hillig,* an employee obtained a jury verdict in a case alleging that negative job references given by his former employer were retaliatory, but the trial court set aside the verdict and granted judgment as a matter of law to the employer, finding that there was insufficient proof

that the negative references constituted an adverse employment action. The 10th Circuit disagreed with the trial court, finding that the negative references were sufficiently adverse. 381 F.3d at 1035. Finding no other issues raised as to the sufficiency of the verdict, the Court of Appeals reversed the trial court's decision, and directed that the verdict be reinstated. *Id.* Again, the relevance of *Hillig* to the issues presented here is unclear. The Plaintiff parses portions of the 10th Circuit's summary of the procedural posture of *Hillig* as suggesting that the 10th Circuit was finding fault with the trial court's use of a "but for" test, but this is a misreading of *Hillig*. The sole issue considered by the Court of Appeals was whether there was sufficient evidence of an adverse employment action, and any attempt to construe *Hillig* as addressing any other issue misreads the scope of the court's analysis and ruling.

Thus, none of the 10th Circuit cases cited by the Plaintiff persuasively rebut the weight of authority in other circuits that suggests that, in a "pretext" case, a plaintiff must show that retaliatory intent was the "but for" or "determinative" cause of the adverse employment action.[8]

_____

[8]Admittedly, the 10th Circuit case cited by the Court at the charging conference, *Piercy v. Maketa*, 480 F.3d 1192, 1201 (10th Cir. 2007), does not squarely address the issue, either. In *Piercy*, the court considered an appeal from a grant of summary judgment to the employer on an employee's sex discrimination and retaliation claims. Applying a "pretext" analysis, the 10th Circuit found that the employee was unable to carry her burden of showing that the employer's proffered explanation for the adverse action was pretextual. 480 F.3d at 1198. However, in discussing the pretext phase, the court explained that "simply disbelieving the employer is insufficient," 490 F.3d 1201; that is, the employee must not only show that the employer's proffered reason is pretextual, but also that retaliation was the true reason for the adverse action. *See e.g. Reeves*, 530 U.S. at 147. The court explained that, in addition to showing pretext, the employee must come forward with evidence from which "the fact finder [can] conclude [that] discrimination was a determinative factor in the employer's actions." 480 F.3d at 1201 (emphasis added). The court appears to have gone on to analyze the employee's retaliation claim under that same standard, without further discussion. Given the inapposite procedural posture of *Piercy*, the fact that the court's discussion of the "quantum of proof" is dicta, the arguably oxymoronic use of the phrase "a determinative factor," and the court's liberal use of disparate treatment analysis concepts in retaliation claims, this Court is reluctant to declare *Piercy* as conclusively resolving

In the absence of clear guidance from the 10th Circuit, this Court finds that the weight of authority in other circuits indicates that Title VII retaliation claims brought under a "pretext" theory must show that the decisionmaker's retaliatory intent was the "but for" or "determinative" cause of the adverse action.

In doing so, however, the Court pauses to consider how such a finding squares with another aspect of the Supreme Court's analysis in *Price Waterhouse*. Before it crafted the "mixed-motive" analysis, the Court in *Price Waterhouse* first considered the standard of causation necessary to establish a claim of disparate treatment based on sex under 42 U.S.C. § 2000e-2(a)(1), which, like the anti-retaliation language of § 2000e-3(a), prohibits employers from making employment decisions "because of" an employee's sex (among other protected characteristics). The Court rejected the employer's suggestion that the statutory language prohibiting discrimination "because of" the employee's sex required application of a "but for" test, explaining that a "but for" analysis is purely hypothetical and retrospective, necessarily assuming that the prohibited motive was a factor in the actual decision. *Id*. at 240-41. The Court instead interpreted Title VII to mean that a decision was made "because of" the employee's protected characteristics whenever illegitimate consideration of those characteristics was present in the employer's decisionmaking, even if the illegitimate concerns were intermixed with legitimate ones. *Id.* at 241. Thus, it found that an employer would be liable for disparate treatment discrimination if the employee showed that impermissible considerations were a "motivating factor" in the employer's decision. *Id.* at 244.

---

the issues here. Nevertheless, its analysis comes closer to the issues presented here than do the cases cited by the Plaintiff, and in that respect, the Court finds it more persuasive than those cases.

One could argue that if the use of the phrase "because of" in the disparate treatment context of § 2000e-2 cannot support the use of a "but for" test, it is inappropriate to construe the same "because of" language in § 2000e-3 to warrant the "but for" test in retaliation claims. However, the Court in *Price Waterhouse* expressly noted that its analysis applied only to "mixed-motive"-type cases, and that the analysis to be used in "pretext" cases remained unchanged. 490 U.S. at 246-47. In doing so, the Court highlighted the fundamental difference between "pretext" and "mixed-motive" cases. In a "pretext" case, the job of the factfinder is to determine "the true reason" for the adverse action. 490 U.S. at 247 (emphasis in original). In other words, the *McDonnell-Douglas* framework contemplates that there is one, and only one, actual reason for the employer's decision. *Id.* ("the premise of [*McDonnell-Douglas*] is that either a legitimate or an illegitimate set of considerations led to the challenged decision") (emphasis in original). Thus, in a "pretext"-type case, it is logically impossible for retaliation to be a "motivating" factor, but not also rise to the level of being the "determinative" factor causing the adverse action, because the analysis contemplates only one possible cause for the decision. Attempting to invoke the "pretext" analysis in cases where the employee contends that the employer entertained multiple justifications for the action is asking the *McDonnell-Douglas* analysis to "perform work that it was never intended to perform." *Id.* Rather, when an employee contends (or, more likely, concedes) that both legitimate and illegitimate considerations jointly lead to the adverse action, only the "mixed-motive" analysis and its attendant "motivating factor" test can sort through the multiple possibilities. Viewed through this lens, *Price Waterhouse* does not deprecate the "but for" test; rather, if anything, it requires such a test to be used in all "pretext"-type cases. *But see Miller v. CIGNA Corp.*, 47 F.3d 586, 593-99 (8th Cir. 1995) (*en banc*) (suggesting that

*McDonnell-Douglas* framework can contemplate multiple causes, but reading *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) to nevertheless compel use of a "determinative factor" test).

Thus, this Court finds that, as a matter of apparent first impression in this Circuit, the proper instruction to be given to a jury in a "pretext"-style retaliation case under Title VII is that the jury can find for the plaintiff only if it finds that the plaintiff's engaging in protected activity was the "but for" or "determinative factor" in the employer's decision to take an adverse action against the plaintiff. Accordingly, the Court finds that its instruction to the jury was correct, and the Plaintiff's motion seeking a new trial on this ground is denied.

### 2. The "pretext" instruction

The Plaintiff also takes issue with the Court's jury instruction relating to pretext. In the second paragraph of Instruction 12, the Court stated: ". . . if you find that Ms. Vialpando has shown, by a preponderance of the evidence, that the reasons given by the employer for the adverse actions in this case are untrue, you may – but are not required to – infer that retaliation was the real reason for the actions."

The Plaintiff raises two arguments with regard to this instruction. First, she contends that it "does not adequately explain to the jury the role pretext may play in a case, specifically that a jury may infer the answer to the ultimate issue before them . . . from the circumstantial and/or direct evidence in the case." She contends that "the reference to inferring retaliatory intent appears as an afterthought at the end of the causation instruction." Second, she argues that "there are many ways to show pretext, but the Court only allowed reference to one such method in the instruction." She argues that cases such as *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000), establish that an employee may show pretext in a variety of ways,

and suggests that the Court's instruction limited the jury to considering only one of the possible ways in which the Plaintiff could show that the Defendant's proffered explanations were pretextual.

As to the Plaintiff's first argument, the Court understands the Plaintiff to be arguing not that the instruction that was given was somehow inaccurate – indeed, the instruction the Court gave specifically advised the jury that they could infer the ultimate issue of retaliation simply by rejecting the employer's proffered reason (and other instructions the Court gave addressed drawing inferences from the evidence presented). Rather, the Plaintiff appears to be arguing that the instruction given was incomplete and that an instruction that explained the concept of "pretext" more fully would have been preferable. The Plaintiff does not cite any law for the proposition that the instruction given by the Court was inadequate, and in fact, the instruction given by the Court is effectively identical to the operative words that the 10th Circuit required in *Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1241 (10th Cir. 2002) ("we hold that in cases such as this, a trial court must instruct jurors that if they disbelieve an employer's proffered explanation they may- but need not- infer that the employer's true motive was discriminatory"). The fact that the Plaintiff would have preferred that the jurors receive a more thorough explanation of the concept of pretext does not warrant a new trial.

As to the Plaintiff's second argument, she is correct that in *Kendrick*, the 10th Circuit observed that "a plaintiff typically makes a showing of pretext in one of three ways," that is, "with evidence that the defendant's stated reason for the adverse employment action was false," "with evidence that the defendant acted contrary to a written company policy describing the action to be taken by the defendant under the circumstances," or "with evidence that the defendant acted

contrary to an unwritten policy or contrary to company practice." 220 F.3d at 1230. However, this Court does not read *Kendrick* – a case articulating the ways in which a plaintiff can show pretext in order to defeat a summary judgment motion – as purporting to require that any <u>jury instruction</u> regarding the notion of "pretext" be so detailed. Indeed, *Townsend*, decided two years after *Kendrick*, does not suggest that all three methods of showing pretext be included in any pretext instruction. Rather, *Townsend* requires a pretext instruction to be given only "where . . . a rational finder of fact could reasonably find <u>the defendant's explanation false</u> and could infer" discrimination from such falsity. 294 F.3d at 1241 (emphasis added). Neither *Townsend*, nor any other case cited by the Plaintiff or located by this Court, requires that a trial court to give a different or expanded pretext instruction where the plaintiff's theory of pretext relies on the defendant's non-compliance with written or unwritten policies.

In any event, the Court has some doubt that such an instruction would serve any useful purpose. The very notion of "pretext" is that the employer has proffered an untrue reason for its actions. Whether the proffered reason is untrue because it is fabricated outright, or whether it is untrue because the employer purported to be carrying out a written or unwritten policy when, in fact, it was acting contrary to such a policy, is largely irrelevant. As discussed above, in "pretext" cases, the key inquiry for the jury is whether the employer's proffered explanation is, for one reason or another, untrue; it is the untruthfulness of the employer's proffered justification that permits the jury to infer that it conceals a discriminatory purpose. *Reeves*, 530 U.S. at 147. An instruction to jurors that they can infer discrimination if they find the proffered explanation to be untrue does not and did not prevent the Plaintiff from arguing that the proffered reason was untrue because the employer failed to follow its own policies. In fact, the Plaintiff expressly

argued in her closing that "it's just too convenient" that the Defendant relied upon a qualification – a college degree – not mentioned in the job posting for Deputy Director in order to select Black over the Plaintiff. This is, in essence, an argument that the Defendant's proffered reason for selecting Black was untrue, and thus, pretextual.

Accordingly, the Court finds nothing in the pretext instruction that was inaccurate, nor that the jury was materially misled by the omission of any particular language. The Plaintiff's motion for a new trial on this ground is denied.

### 3. Judgment as a matter of law on the desk audit claim

Finally, the Plaintiff seeks a new trial on her claim that Thomas retaliated against her by interfering with her desk audit. The Court granted judgment as a matter of law under Fed. R. Civ. P. 50(a) to the Defendant on this claim at the close of the Plaintiff's case, finding that the Plaintiff had not come forward with evidence that Thomas[9] had any control or influence over the outcome of the audit. The Plaintiff now points to evidence that she contends was sufficient to show Thomas' involvement.

The facts underlying the desk audit claim are as follows. The Plaintiff had previously settled a grievance by agreeing to have a desk audit determine whether she was performing work at a GS 14 grade level, instead of the GS 13 grade she held. The Plaintiff agreed to have the audit performed by Debbie Kolen. Kolen testified that she reviewed the Plaintiff's official job description, as well as the job description for the Deputy Director (GS 14) position; submitted questionnaires to, and later interviewed the Plaintiff and the Plaintiff's immediate supervisor, Jim

---

[9]Thomas is the only individual alleged to have harbored any retaliatory animus against the Plaintiff.

Everedge; interviewed other employees in the office who were performing the same type of work as the Plaintiff; and reviewed an unofficial job description prepared by the Plaintiff that the Plaintiff claimed was a "more accurate description of her work" than the official job description.[10] Kolen concluded that the Plaintiff was actually performing work <u>below</u> her GS 13 level, and discussed her conclusion with Everedge, recommending ways in which the Plaintiff's work could be raised to the GS 13 level.

Once again, this claim is governed by the *McDonnell-Douglas* "pretext" analysis. In the final stage of that analysis, the Plaintiff has the burden of showing that the Defendant's proffered reason for refusing to upgrade her to a GS 14 level – *i.e.* that Kolen's independent desk audit concluded that the Plaintiff was not entitled to a GS 14 classification – was a pretext for unlawful retaliation. The Plaintiff raises four arguments in support of her contention that she produced evidence that this reason was pretextual: (i) that although Kolen did not report directly to Thomas, Kolen's supervisor, Steve Nelson, provided Human Resources services to the Job Corps agency that Thomas headed, and thus, "the link between Mr. Thomas and the audit could be inferred because of the agency relationship between the parties involved"; (ii) that circumstantial evidence suggests that Thomas interfered with the audit directly by discussing it with Kolen; (iii) that Thomas's subordinate, Michael Parks, improperly directed Kolen to interview certain individuals as part of the audit; and (iv) that the audit performed by Kolen so deviated from established procedures that its results were suspect.

---

[10]Kolen ultimately determined that the job description created by the Plaintiff was less reflective of the work the Plaintiff actually performed than the official job description, largely because she found that the Plaintiff did not actually develop policies her self-created job description claimed she did.

Turning first to the Plaintiff's argument that the mere fact that Kolen was organizationally connected to Thomas suffices to demonstrate pretext, the Court finds that this is insufficient evidence to permit the jury to infer that Thomas had any influence in the outcome of the audit. In support of this argument, the Plaintiff cites to *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476 (10th Cir. 2006). In that case, the 10th Circuit considered the "cat's paw" doctrine – the situation in which "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Id.* at 484. The Court "strongly signaled [its] endorsement of the theory . . . that under certain circumstances, a defendant may be held liable for a subordinate employee's prejudice even if the manager lacked discriminatory intent." *Id.* at 485.

The "cat's paw" doctrine does not apply in this case, as the Plaintiff does not allege that Kolen – the "subordinate" – harbored a retaliatory bias against the Plaintiff, and duped the otherwise innocent Thomas – the manager – into taking an adverse action against the Plaintiff. Indeed, the evidence, taken in the light most favorable to the Plaintiff, is just the opposite – that Thomas held both the retaliatory animus and the ability to act, but it was innocently-motivated Kolen who recommended the adverse action. Under these circumstances, the "cat's paw" theory is inapplicable. Moreover, the Plaintiff points to no evidence that would suggest that the attenuated organizational relationship between Kolen and Thomas warrants an inference that Thomas actually interfered with Kolen's audit, nor that Kolen felt obligated to reach a certain result in order to satisfy Thomas.

The Plaintiff's second argument focuses on an inconsistency in Kolen's testimony. After conducting the audit, Kolen issued her decision in writing on December 13, 2001. However, at

trial, the Plaintiff produced two different versions of the final decision document, both signed by

Kolen and bearing the December 13, 2001 date. Both versions reached the same conclusion –

that the Plaintiff was properly classified at the GS 13 level– but there was a statement of

reasoning in one document and no such explanation in the other. Kolen characterized one of the

versions as a "draft," but was unable to say which one was the "operative" version. Kolen

testified that once she had formally issued her final (not draft) report, she hand-carried a copy to

Thomas' office and, in Thomas' absence, left a copy on his desk for his information (given that

the audit concerned one of his subordinates). Kolen testified that she never spoke with Thomas at

any point prior to the trial.

The Plaintiff then attempted to "refresh" Kolen's recollection by supplying her with an e-

mail message from April 2002, in which Kolen apparently stated to someone else that she had

spoken with Thomas about her post-audit conclusions and that Thomas was in agreement. Kolen

testified that the e-mail did not refresh her recollection as to whether she had previously spoken

with Thomas, but stated that "if I said that, I did." Pressed on that point, Kolen stated "the e-mail

says I spoke with him, but I can't remember talking with Mr. Thomas."[11] The e-mail that the

Plaintiff used to attempt to refresh Kolen's recollection was never admitted into evidence, and its

precise contents are not part of the record.

The Plaintiff argues that this evidence is sufficient to permit the jury to infer that Thomas

influenced the outcome of Kolen's audit. The crux of the Plaintiff's argument turns on the

inconsistency between Kolen's testimony that she never spoke with Thomas, and the unadmitted

---

[11]For his part, Thomas testified that he does not believe he has communicated with Kolen
at any time.

e-mail in which she apparently stated something to the effect that she had spoken with Thomas and he had concurred with her conclusion. In making this argument, however, the Plaintiff misconstrues the purpose that is served by attempting to refresh a witness' recollection. When a party attempts to refresh a witness' recollection under Fed. R. Evid. 612, the purpose is merely to "revive[ ]" the witness' memory, such that "he presently recollects the facts and swears to them." *See generally U.S. v. Rinke*, 778 F.2d 581, 588 (10th Cir. 1985). It is the witness' refreshed recollection of the facts, not the contents of the writing used to refresh the recollection, that is the substantive evidence of a fact. *Rush v. Illinois Cent. RR Co.*, 399 F.3d 705, 718 (6th Cir. 2005). Using the guise of "refreshing recollection" to admit the contents of a document as substantive evidence instead is improper, as it implicates the concerns underlying the hearsay rule. *Id.* at 719.

In this case, the Plaintiff ostensibly used the e-mail to refresh Kolen's recollection regarding her communications with Thomas.[12] As such, the contents of the e-mail are not substantive evidence of any fact. Only Kolen's present (albeit refreshed) recollection of past events may be considered by the jury as substantive proof of whether or not she communicated with Thomas, and Kolen testified that, despite the attempt to refresh her recollection, she did not recall ever having spoken to Thomas. Without admitting the contents of the e-mail itself as substantive evidence, the Plaintiff did not produce substantive evidence that controverted Kolen's otherwise conclusive testimony that she had not conversed with Thomas at any time. Thus, there

_____

[12]In actuality, it appears that the Plaintiff's true purpose was to impeach Kolen's prior, unequivocal testimony that she had never communicated with Thomas, not to overcome an inability by Kolen to recall past events. Nevertheless, even if the Plaintiff had utilized the proper means to impeach Kolen, the result would be no different. Impeachment by means of a prior inconsistent statement merely serves to raise the issue of the witness' present credibility; it does not serve to admit the prior statement as substantive evidence of a fact. *U.S. v. Severson*, 49 F.3d 268, 272 (7th Cir. 1995).

was no evidence in the record upon which the jury could conclude that Kolen had, in fact, spoken to Thomas before issuing the audit's results.

Moreover, even assuming that the Plaintiff could have successfully placed before the jury substantive evidence that Kolen had, in fact, discussed her conclusions with Thomas and that Thomas concurred, the Plaintiff's theory that Thomas somehow interfered with Kolen's audit would still be nothing more than speculation. Implicit in the notion that Kolen discussed her conclusions with Thomas is the fact that Kolen must have reached those conclusions <u>before</u> speaking to Thomas. Similarly, implicit in the notion that Thomas concurred with Kolen's conclusions is the fact that Kolen must necessarily have concluded that the Plaintiff was properly classified as a GS 13. Thus, assuming all the facts and inferences suggested by the Plaintiff, the record reflects that Kolen independently reached a conclusion that the Plaintiff was properly classified, presented that conclusion to Thomas, and that Thomas agreed with the result. To draw the inference that Thomas somehow influenced Kolen's conclusions would require the jury to find – without any evidentiary support whatsoever – that Thomas had some communication with Kolen <u>before</u> she reached her conclusions. Accordingly, the Court finds no evidence in the record to support the Plaintiff's theory that Thomas directly interfered with Kolen's audit of the Plaintiff's position.

The Plaintiff's third argument is that Thomas indirectly interfered with the audit through Michael Parks, the Job Corps' Human Resources Officer. As with Kolen's testimony regarding her communications with Thomas, there were some inconsistencies in the evidence regarding her communications with Parks. Kolen testified that she never met with or communicated with Parks until the audit was complete and she had rendered her decision. Parks testified that he met with

Kolen at the beginning of the audit, and suggested that Kolen interview certain of the Plaintiff's co-workers to ascertain the types of tasks the Plaintiff performed. Although there was certainly conflicting testimony on this point, it is largely irrelevant, as there is no evidence to suggest that Parks either harbored retaliatory animus against the Plaintiff, or that he was aware of and communicated Thomas' retaliatory animus to Kolen. Beyond the argument that Parks' involvement represents a procedural aberration in Kolen's audit – an argument the Court addresses below – the fact that Parks may have met with Kolen prior to the audit does nothing to advance the contention that Kolen's audit was tainted by Thomas' retaliatory intent. Accordingly, this argument fails to demonstrate that the Defendant's proffered reason is pretextual.

Finally, the Plaintiff makes a generalized argument that Kolen's audit deviated from established practices in conducting desk audits of this sort. The Plaintiff offered Paul Katz, an expert in the field of Personnel Classification in the federal government, who opined that Kolen's conclusions following the audit were incorrect because, among other things, Kolen relied on the incorrect job description for the Plaintiff and improperly disregarded certain information that Katz believed was determinative. From this, the Plaintiff argues that Kolen's failure to follow established procedures in conducting the audit is evidence that the Defendant's proffered reason for an employment action is pretext for retaliation. *See e.g. Kendrick*, 220 F.3d at 1230.

Although the Plaintiff is correct that *Kendrick* contemplates deviations from established workplace procedures as one means by which an employee can show a proffered explanation to be pretextual, she misapplies that concept to the facts of this case. Here, even assuming that Kolen deviated substantially from established procedures in conducting a desk audit, it is an insufficient means of demonstrating that the Defendant's proffered reason for denying the

27

Plaintiff's request for an upgrade to GS 14 was pretext for retaliation, because the Plaintiff did not show that Kolen herself harbored any retaliatory intent. The Defendant's proffered non-retaliatory reason for denying the Plaintiff an upgrade to GS 14 was that an independent auditor determined, after conducting a desk audit, that the Plaintiff was not entitled to that upgrade. To prove that this explanation is a pretext for retaliation under *Kendrick*'s "procedural deviation" approach, the Plaintiff would have to demonstrate that some official within the Defendant both <u>recognized</u> that Kolen had engaged in procedural errors that called the correctness of her conclusions into question, and that that person nevertheless <u>chose</u> not to question (and instead, to defer to) Kolen's results because that person intended to retaliate against the Plaintiff. An employer who relies upon a procedurally defective recommendation in carrying out an adverse action against an employee can hardly be said to have <u>intentionally</u> retaliated against that employee if the employer did not <u>know</u> that the recommendation was defective. *See e.g. Randle v. City of Aurora*, 69 F.3d 441, 455 ("the City offered evidence that it believed that it was following its own internal procedures, and thus, even if the failure to announce this position was a mistake, it was not pretextual. That is, just because the reasoning relied upon for a certain action is mistaken does not mean that the reason is pretextual").

In this regard, the Plaintiff did not come forward with any evidence that Kolen recognized that her audit was procedurally improper,[13] much less that Thomas did so as well and nevertheless deferred to Kolen's recommendation in order to animate his retaliatory intent towards the

---

[13]Even assuming that Kolen recognized that there were defects in her audit – *i.e.* accepting her testimony that Parks should not have been involved, and crediting Parks' testimony that he spoke with Kolen before the audit – the jury still could not have inferred that Kolen's recommendations were pretext for retaliation when it was undisputed that Kolen had no prior knowledge of the Plaintiff's protected activity.

Plaintiff. At best, the Plaintiff has shown that the Defendant acted in reliance upon flawed recommendations from Kolen, but that it did so without any knowledge of those flaws. This is insufficient to carry her burden of showing that the Defendants' reliance upon Kolen's recommendation was a pretext for retaliation. *Randle*, *id.*

Accordingly, the Court's decision to grant judgment as a matter of law to the Defendants on the Plaintiff's desk audit claim was not erroneous, and the Plaintiff's motion for a new trial on this claim is denied.

### B. Defendant's Motion for Judgment as a Matter of Law

The Defendant moves to set aside the jury's verdict and enter judgment as a matter of law on the Plaintiff's claim that the reduction of her bonus was retaliatory. Specifically, the Defendant argues that Thomas' decision to reduce the Plaintiff's recommended bonus from $5,000 to $2,000 cannot constitute an "adverse employment action," and that, if it can, the Plaintiff failed to show a sufficient causal connection between her protected activity and Thomas' decision to reduce her bonus.

Turning to the first issue, the Supreme Court has recently relaxed the degree of proof that is required for a retaliation plaintiff to demonstrate the existence of an adverse employment action. In *Burlington Northern and Santa Fe RR Co. v. White*, 126 S.Ct. 2405, 2415 (2006), the Court explained that an employee alleging an adverse action in a retaliation claim must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Internal quotes omitted). The Court differentiated these actions from "petty slights, minor annoyances, and simple lack of good manners." *Id.*

Here, there can be little doubt that a decision that effectively deprives an employee of $3,000 in compensation is the type of action that might dissuade an employee from invoking his or her rights under Title VII. However, the Court understands the Defendant's actual argument to be that, as a factual matter, the Plaintiff had no vested interest in the fact that her immediate supervisor "recommended" the $5,000 bonus, nor could she reasonably rely on that recommendation being accepted by those responsible for actually authorizing the bonus. The evidence at trial was that Thomas had never previously reduced any bonus amount recommended by an employee's immediate supervisor, and that he had approved a similar bonus, also recommended by Everedge, for another employee who had participated on the same project-planning committee as the Plaintiff in 2004. Under these circumstances, the Court finds that there was sufficient evidence from which a jury could find that Thomas' unprecedented objection to Everedge's recommendation that the Plaintiff receive a higher bonus was the type of conduct that could deter a reasonable employee from invoking Title VII.

The Defendant's second argument is that the Plaintiff failed to adduce evidence that would show a causal connection between the Plaintiff's protected activity and Thomas' decision to reduce her bonus. If one limits the notion of "protected activity" to the filing of grievances or complaints of discrimination, this argument might have merit. It is undisputed that the Plaintiff filed her most recent complaint of discrimination in January 2003, and that the decision by Thomas to reduce her bonus occurred nearly two full years later, in December 2004. However, 42 U.S.C. § 2000e-3's definition of protected activity also includes "testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter." Here, the Plaintiff contends that Thomas' decision to reduce her bonus occurred "a couple of

weeks" after Thomas was notified that he would have to travel from Washington to Denver to give a deposition in the administrative proceeding resulting from the Plaintiff's January 2003 complaint. Thomas testified that he did not want to come to Denver for the deposition, and thus, the jury could reasonably infer that Thomas' annoyance at having to be involved in an administrative proceeding involving the Plaintiff's complaint of discrimination caused Thomas to decide, a "couple of weeks" later, to reduce her bonus.

Accordingly, the Defendant's Renewed Motion for Judgment as a Matter of Law is denied.

### C. Attorney's Fees

The Plaintiff seeks an award of attorney's fees under 42 U.S.C. § 1988 and § 2000e-5(k). The Defendant does not dispute that the Plaintiff is a prevailing party and entitled to a fee award. The Defendant disputes only the amount of fees that are appropriately awarded.

When considering a claim for attorney's fees under 42 U.S.C. § 1988, the moving party bears the burden of proving her entitlement to an award, as well as the appropriateness of the hours expended and the hourly rate sought. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Once the Plaintiff carries her burden of establishing an appropriate amount of hours spent and a reasonable rate, those numbers are used to generate a "lodestar" amount. *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). The lodestar is a presumptively reasonable fee award, taking into account most of the factors that bear on the reasonableness of the award, and thus, adjustments to the lodestar should only be made in rare and exceptional cases. *Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546, 564-65 (1986).

Here, the Plaintiff has requested a total of $137,850.01 in attorney's fees, and $6,106.41 in costs, for a total request of $143,956.42. The Plaintiff later supplemented **(# 75)** the fee request, seeking an additional $12,884.19 in fees and costs relating to post-verdict work on behalf of the Plaintiff.

1. Reasonable rate

The Court determines a reasonable hourly rate based on the parties' submitted evidence of market data showing rates charged by attorneys of comparable skill and experience in the area. *Case v. Unified School Dist.*, 157 F.3d 1243, 1256 (10th Cir. 1998).

The Plaintiff's counsel primarily billed their time at $275 per hour, with some additional work by "contract attorneys," billed at a rate of $75 per hour. The Plaintiff has come forward with evidence that a rate of $275 per hour is reasonable for experienced employment attorneys in the Denver area.[14] In response, the Defendant does not adduce contrary evidence, but merely suggests that the Court apply its own "knowledge of prevailing market rates." In doing so, the Defendant misreads *Lucero v. City of Trinidad*, 815 F.2d 1384, 1385-86 (10th Cir. 1987), which permits the Court to turn to other sources of data to determine a reasonable rate where the movant has not come forward with evidence supporting the requested rate. Here, the Plaintiff has come forward with uncontested evidence supporting the $275 rate, and in the absence of evidence to the contrary, the Court finds that rate to be reasonable.

2. Reasonable hours

---

[14]Pursuant to the parties' Response **(# 73)** to the Court's Order to Show Cause, the Court has considered the affidavit of Elwyn Schaefer in support of the Plaintiff's motion, and deems the Plaintiff's submission of the affidavit of Stephanie Struble to be withdrawn without having been considered by the Court.

The Court's analysis of the question of reasonable hours is framed largely by two decisions from the United States Supreme Court. In *Hensley*, the Court observed that the extent of the results obtained by the plaintiff was an "important factor" in the fee calculation. 461 U.S. at 424. In situations where a plaintiff achieved less than total success, *Hensley* suggests a two-part inquiry to determine whether to accept the total number of hours worked as reasonable: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* With regard to the first inquiry, work on claims that are inextricably linked or which arise from the same core facts should be compensable even though only some of the legal theories applied to those facts were successful. *Id.* By contrast, where separate claims could logically have been brought as separate lawsuits, it would be inappropriate to award fees on the unsuccessful claims. *Id.* With regard to the second inquiry, *Hensley* suggests that "[w]hen a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," even though some of the theories urged by that plaintiff were rejected. 461 U.S. at 435. By contrast, if the plaintiff "achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436.

The Court revisited the issue again three years later in *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986). There, the Court rejected an argument that an attorney's fee award in a civil rights case should not exceed some precise mathematical multiplier of the amount of damages awarded. *Id.* Although the amount awarded is "certainly relevant" to the analysis, the Court cautioned that it is only one of several factors to be considered. *Id.* However, the Court

noted that "where recovery of private damages is the purpose of a civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought." *Id.* at 585.

In response to the Plaintiff's request for fees, the Defendant argues that the Court should eliminate 33.5 hours of time claimed by the Plaintiffs on the ground that these hours are not reasonably billable,[15] and then argues that the Plaintiff's overall billings should be reduced by 70% to account for the Plaintiff's limited success.

It is clear that the Plaintiff only achieved partial success. As initially framed, the Plaintiff asserted as many as twelve claims at trial – that is, a claim of sex discrimination, age discrimination, national origin discrimination, and retaliation as to each of the three alleged adverse actions. Of those, the Court granted judgment as a matter of law to the Defendant on ten claims – all of the sex, age, and national origin discrimination claims, and the retaliation claim premised on the desk audit – on the grounds that the Plaintiff had not come forward with sufficient evidence to prove those claims. Of the two claims that went to the jury, the Plaintiff was successful on one – the claim relating to the Plaintiff's reduced bonus. Although the Plaintiff

---

[15]The Defendant only specifically identifies a .75 hour billing entry on April 4, 2004, involving a telephone call to the Plaintiff's daughter, and billing entries for August 10, 2006 and April 6, 2007, in which the Plaintiff's two attorneys both billed time for attending court hearings. The Defendant does not identify, specifically or generally, the remaining billing entries that it contends were unreasonable. Without specific identification – by date, by description, or by category – of the objectionable entries, the Court is left to its own devices to comb numerous pages of billing statements. The Court declines to take an unescorted tour of the billing records, and thus, reduces the Plaintiffs' requested hours by only .75 hours for the April 4, 2004 phone call, 2.5 hours representing travel time and attendance at the August 10, 2006 conference by one of the Plaintiff's two counsel, and 3.12 hours representing travel time and attendance for one lawyer at the April 6, 2007 settlement conference. This reduces the Plaintiff's request for fees by $1,751.75.

suggested in her closing argument that the jury consider an award of compensatory damages in the amount of $35,000 per year for four years (a total of $140,000), the jury ultimately awarded her only $7,000 in damages.

Viewing the issues raised in the trial as a whole, the Court finds that a substantial reduction of the Plaintiff's claimed fees is necessary to reflect the Plaintiff's partial success. Other than the jury instruction issue, the trial of this case did not involve novel or highly contested issues of law. Indeed, the bulk of the time spent by the Plaintiff's counsel was in the development and presentation of factual issues. The Plaintiff's successful claim relating to her bonus shared few common issues of fact with the Plaintiff's unsuccessful claims relating to her job duties and classification, and those claims could easily have been brought in separate lawsuits. Had the Plaintiff only presented the successful bonus claim from the inception of this litigation, much of the time spent by her attorneys could have been avoided. The Plaintiff's billing records are not sufficiently granular to permit the Court to precisely excise time spent developing anything other than the bonus claim, and thus, the Court can only make a wholesale percentage reduction to account for the unsuccessful claims.

If the Court were to assume that presenting each of the three adverse employment actions involved equal amounts of effort, the Court would have to reduce the Plaintiff's claim for fees by nearly 60%. (However, the Court would not make a full 66% reduction, recognizing that there were some common facts to all three adverse actions – *e.g.* developing facts showing Thomas' animus arising from the Plaintiff's prior protected conduct.)

The Court finds that the three adverse employment actions were not equal to each other in factual complexity. The facts underlying the Plaintiff's bonus claim were simple and

35

straightforward, whereas her claims relating to her job duties and classifications were far more complex. For example, the Plaintiff called an expert witness to opine as to matters involving the classification of her position, but this witness would not have testified at all had trial addressed only the single claim on which the Plaintiff succeeded. Similarly, witnesses such as Kolen testified only as to claims related to the Plaintiff's job duties, not to her bonus. Thus, the Court finds that a reduction of <u>more</u> than 60% is necessary to reflect the Plaintiff's success only on the less factually-complicated bonus claim. The Court concludes that the Defendant's request for a 70% reduction of claimed fees is a reasonable reflection of the Plaintiff's limited success in this matter.

Accordingly, the lodestar calculation is as follows: the Plaintiff's initial request for $137,850.01 is reduced by $1,751.75 for the three unnecessary billing entries cited above. The resulting figure – $136,098.26 – is reduced by 70%, yielding a lodestar of $40,829.48. Neither party has suggested that the lodestar be adjusted based on special circumstances, and thus, this figure is the amount of fees the Court awards. The Court finds, in general, this to be a reasonable attorney's fee, given the nature of the claim, the inherent costs of bringing a case to trial, and the amount of damages awarded to the Plaintiff by the jury.

In doing so, the Court has consciously rejected the Plaintiff's supplemental request for fees resulting from post-verdict motion practice. The bulk of the time identified in the billing entries supporting the supplemental request relate to the Plaintiff's research and preparation of her unsuccessful motion for a new trial. Although a relatively small amount of the time identified in the supplemental request might be compensable – *e.g.* time spent responding to the Defendant's post-verdict motion, time spent obtaining taxation of costs, and time spent preparing the attorney's fee motion – the Court finds that this time is more than offset by several billing entries

included in the Plaintiff's <u>original</u> motion for attorney's fees that relate to the unsuccessful new

trial motion. *See e.g.* entries dated 5/30/07 - 6/4/07 (billing more than 20 hours for research and

drafting of motion for new trial).   Because these hours in the original motion for fees were, but

should not have been, included in the calculation of the lodestar amount, the Court finds that the

Plaintiff is not prejudiced  if the Court offsets the improper inclusion of time spent on the

Plaintiff's new trial motion by simply disregarding compensable time listed in the Plaintiff's

supplemental request for fees.

Turning to the Plaintiff's request for costs, the Plaintiff seeks reimbursement for copying

costs, postage, mileage and parking expenses, court reporter fees, and fees for her expert witness.

The Defendant responds that some of the requested costs, including the fees for the expert

witness and court reporter fees for certain witnesses, do not relate to the Plaintiff's successful

claim regarding her bonus.  As to costs for matters such as copying and postage, the Defendant

argues that these fees were included in the costs taxed by the Clerk or later awarded by the

Magistrate Judge.

The Court declines to award costs involving travel or parking.  As the Plaintiff notes,

these costs <u>may</u> be reimbursable, subject to a showing that these types of costs are "normally

billed to a private client in the local area." *Bee v. Graves*, 910 F.2d 686, 690 (10th Cir. 1990).

The Court has reviewed the affidavits supporting the Plaintiff's motion for fees and costs, and

finds no contention that mileage and parking costs are normally billed to private clients by lawyers

in the Denver area.  Accordingly, these costs are rejected.  For similar reasons, the Court rejects

the Plaintiff's request for reimbursement of online legal research expenses.  The affidavits

supporting the original and supplemental fee requests do not indicate that the cited Lexis bills

reflect work performed specifically for this case, nor describe the manner in which the Plaintiff's counsel account for such costs, nor do they establish that such charges are normally billed to the client. *See generally InvesSys, Inc. v. McGraw-Hill Companies, Ltd.*, 369 F.3d 16, 22-23 & n. 5 (1st Cir. 2004), *cited with approval in Sorbo v. United Parcel Service*, 432 F.3d 1169, 1180 n. 10 (10th Cir. 2005). The Court also rejects the Plaintiff's request for fees for her expert witness, and costs of deposition transcripts for other witnesses. The Plaintiff has not shown that these witnesses had testimony to give that was relevant to her claim based on the reduction of her bonus. The Plaintiff cannot recover expenses incurred on claims for which she was not successful. For similar reasons, the Court disallows expenses relating to copying and postage costs involving the Plaintiff's expert witness.

The Court allows the expenses listed for copying and postage relating to the Plaintiff's initial document production, as those items do not appear to fall within the costs taxed by the Clerk. The Plaintiff contends that her claim for expenses relating to the deposition of Thomas in January 2005 falls outside the scope of the costs taxed by the Clerk, and this argument appears to have merit as well. As itemized in the Plaintiff's fee request, these allowed charges total $125.85. The Court will grant the Plaintiff's expenses in this amount.

Accordingly, the Court approves an award of attorney's fees and costs in the amount of $40,955.33.

## **CONCLUSION**

For the foregoing reasons, the Defendant's Renewed Motion for Judgment as a Matter of Law **(# 53)** is **DENIED**. The Plaintiff's Motion for New Trial **(# 55)** is **DENIED**. The Plaintiff's

Motion for Attorney's Fees and Costs **(# 54)** is **GRANTED IN PART**, insofar as the Court finds

that the Plaintiff is entitled to an award of $40,955.33 in attorney's fees and costs in this matter,

and **DENIED IN PART**, to the extent the Plaintiff seeks fees and costs above this amount.

Dated this 12th day of February, 2008

**BY THE COURT:**

_____

Marcia S. Krieger
United States District Judge